UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

JOHN CURKAN, Individually and on Behalf    :   Civil Action No.
of All Others Similarly Situated,                :
                                                :   <u>CLASS ACTION</u>
                  Plaintiff,   :
                                                :   COMPLAINT FOR VIOLATION OF THE
    vs.                                   :   FEDERAL SECURITIES LAWS
                                                  :
APHRIA INC., VIC NEUFELD and CARL      :
MERTON,                                             :
                                                  :
                  Defendants.   :
                                                  :

———————————————————— x   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff John Curkan ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Aphria Inc. ("Aphria" or the "Company"), the Company's press releases, and analyst reports, media reports and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased the common stock of Aphria from November 2, 2018 to November 30, 2018, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.     The claims alleged herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

4.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Aphria shares trade in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

6.      Plaintiff John Curkan purchased Aphria shares during the Class Period, as set forth in the accompanying certification incorporated herein, and has been damaged thereby.

7.      Defendant Aphria is a licensed producer and seller of cannabis.

8.      Defendant Vic Neufeld ("Neufeld") is the Chief Executive Officer ("CEO") of Aphria.

9.      Defendant Carl Merton ("Merton") is the Chief Financial Officer ("CFO") of Aphria.

10.      The defendants identified in ¶¶8-9 are referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, the false and misleading statements that artificially inflated the price of Aphria common stock.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being

concealed from the public and that the positive representations being made were then materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

11.     Aphria is a cannabis company based in Ontario, Canada.  The Company is licensed to produce and sell medical cannabis under the provisions of the Canadian *Access to Cannabis for Medical Purposes Regulations.*  Aphria received its license to produce and sell medical cannabis on November 26, 2014, followed by its license to sell cannabis extracts on August 18, 2016.

12.     Producers and distributors of cannabis are part of a fast growing industry, as countries increasingly deregulate the sale and commercialization of marijuana.  According to Arcview Market Research and its research partner BDS Analytics, over the next 10 years the legal cannabis industry spending on legal cannabis worldwide is expected to grow to $57 billion.  The adult-use (recreational) market is expected to cover 67% of the spending and medical marijuana is expected to take up the remaining 33%.

13.     Aphria claimed that it was well positioned to capitalize on this explosive growth in the cannabis industry through its robust acquisition of high-quality international assets.  Most notably, on July 17, 2018, Aphria announced a proposed acquisition of "industry-leading" assets in Latin America and the Caribbean for C$193 million in aggregate transaction consideration (the "Acquisition").

14.     A press release announcing the proposed Acquisition (the "Acquisition Release") stated that the deal would provide the Company with "world class assets" in Colombia, Argentina, Jamaica and Brazil, stating the following in pertinent part:

**Aphria Plans For Global Cannabis Leadership
With International Expansion Acquiring Leading
Assets In Latin America And The Caribbean**

*Aphria medical brands to gain exposure to over 300 million
people, roughly 9 times the size of Canada*

Leamington, Ontario – July 17, 2018 – Aphria Inc. ("Aphria" or the "Company") (TSX: APH and US OTC: APHQF) is proud to announce the Company's planned expansion into Latin America and the Caribbean **with the proposed acquisition of industry-leading companies in Colombia, Argentina, Jamaica and a right of first offer and refusal in respect of Brazil** through a definitive share purchase agreement (the "Agreement") with Scythian Biosciences Inc. ("Scythian"). Aphria will acquire 100% of the issued and outstanding common shares of LATAM Holdings Inc. ("LATAM Holdings"), a direct, wholly-owned subsidiary of Scythian (collectively, the "Transaction").

**Highlights of the Transaction include**:

- Solidifies Aphria's leadership position in the global cannabis industry

- ***Provides Aphria with world class assets in the most advanced regulatory jurisdictions across LATAM and Caribbean markets, from which it can further grow and expand its international operations***

- Strengthens Aphria's leading international management team with the addition of proven local LATAM and Caribbean executives

- ***Establishes Aphria's presence in the most advanced strategic market in South America, Colombia***

- ***Gains first mover advantage in Argentina for eventual in country cultivation***

- ***Acquires market leadership in Jamaica with the only producing Tier 3 cultivator license in the country***

- ***Yields strategic rights to potentially expand into Brazil, the largest population in South America***

- ***Delivers accretive cash flow beginning in calendar 2019***

15.     The Acquisition Release stated that Aphria would be acquiring a 90% interest in a Colombian company expected to achieve "an initial annualized production of 30,000 kg, growing to 50,000 kgs" of "high-quality medical cannabis."  The release stated in pertinent part:

**Colombia – Strategic Launch Pad into South America**

Colcanna S.A.S. ("Colcanna" or the "Colombian Company"), will be the first company in the Coffee Zone of Colombia with cultivation and manufacturing licenses for the production of medicinal extracts of cannabis, a research license and a license for the production and extraction of cannabis, including cannabis oil, for domestic use and for export. It is in the advanced licensing stages for a THC license.

Unlike the former Guerilla territory where other global cannabis companies have focused their investments, the Coffee Zone has always been a land of peace, high productivity and progress.  Colcanna sits on 34 acres of highly fertile, predominately flat land, which is essential for the optimal cultivation of cannabis. As a result, greenhouses will occupy more than 20 acres of the property and, with 6 harvests per year and two natural sources of water for irrigation, *Colcanna is expected to achieve an initial annualized production of 30,000 kg, growing to 50,000 kgs but with access to the country's micro-scale growers, suitable for supplying the country and the region with high-quality medical cannabis*.

16.    The Acquisition Release also stated that Aphria would receive an "established and successful pharmaceutical import and distribution company" in Argentina "at the forefront of in-country medical cannabis research and clinical trials," with a reach "throughout Argentina" and "agreements with the Top 20 health insurance companies," stating in pertinent part:

**Argentina – First Mover Advantage**

ABP, S.A. ("ABP" or the "Argentinean Company") is an *established and successful pharmaceutical import and distribution company* that holds a series of licenses, including for the import of CBD oil, notably the first company in Argentina to have received this license.

*The Argentinean Company operates a pharmaceutical distribution warehouse and retail pharmacy and distributes to an extensive network of pharmacies, distributors, government clinics and hospitals throughout Argentina. ABP also holds agreements with the Top 20 health insurance companies, a strategic advantage in reaching patients accessing Argentina's free public healthcare system*.

*ABP is at the forefront of in-country medical cannabis research and clinical trials with two significant Medical Cannabis Cooperative Agreements*. The Argentinean Company has partnered with Hospital Garrahan, a leading pediatric hospital in Buenos Aires, for a clinical study on the treatment of refractory epilepsy in children, and with Universidad Nacional De La Plata to support advances in medical cannabis research and education.

17.    As to the Jamaican assets offered in the Acquisition, the Acquisition Release stated that the Company would acquire a 49% interest in an entity with "several key licenses" granted by the Jamaican Cannabis Licensing Authority regarding the cultivation, processing and sale of cannabis, therapeutic and medical uses for the plant, and research and development.  It stated that the Company had received the "highest level" of licensing available in Jamaica, a Tier 3 license, which had purportedly only been granted to one other company.  The Acquisition Release stated in pertinent part:

**Jamaica – Only Producing Commercial Tier 3 License**

Marigold Projects Jamaica Limited ("Marigold" or the "Jamaican Company") ***has been granted several key licenses*** by the Jamaican Cannabis Licensing Authority, including:

- A Tier 3 license to cultivate more than five acres of land with cannabis for medical, scientific and therapeutic purposes. ***This license is the highest level of license available in Jamaica, and currently only one other company has been approved for a Tier 3 license***;

- A conditional Tier 2 license to process cannabis for medical, scientific and therapeutic purposes, including the manufacturing of cannabis-based products, in a space of over 200 square meters;

- A conditional herb house retail license to sell cannabis products for medical, scientific and therapeutic purposes, with a space for immediate consumption by consumers, including tourists;

- A conditional therapeutic retail license to provide therapeutic or spa services utilizing cannabis products; and

- A conditional R&D license.

18.    In addition, the Acquisition Release stated that the Acquisition would provide Aphria the right of first offer and refusal to purchase 50.1% of an entity in the strategic Brazilian market expected to hold a medical cannabis license, stating in pertinent part:

**Brazil – Strategic Option for Major Market**

The Company also remains focused on identifying the most attractive emerging opportunities through the region, including in Brazil where, as a result of the Transaction, the Company will receive a right of first offer and refusal (collectively the "Rights") *in respect of a majority interest, upon the receipt of a license, in the entity receiving the license.* With a population over 200 million and a comprehensive National Healthcare System, Brazil is poised to become an important market for medical cannabis, and Aphria's regional and corporate leadership remain connected to the rapidly evolving opportunity in Brazil.

19.     Overall, the Acquisition Release represented to the market that Aphria would be acquiring extremely valuable strategic assets in key cannabis markets.  It quoted Defendant Neufeld as stating that the Acquisition would "provide the strong foundation, relationships and infrastructure to capture significant future growth as more LATAM and Caribbean markets evolve."  It stated in pertinent part:

**Quotes from Leadership**

"Aphria is proud with this initiative to create a true leader in medical cannabis across LATAM and extend our leadership in the global industry," said Vic Neufeld, Chief Executive Officer at Aphria.   "We have spent a considerable amount of time and resources evaluating opportunities in Latin America and the Caribbean and we are confident in the long-term strategic opportunity and the value it will bring to our shareholders.  *The Transaction, once completed, will firmly place Aphria at the center of the medical cannabis industry in the region, and will provide the strong foundation, relationships and infrastructure to capture significant future growth as more LATAM and Caribbean markets evolve*.  We truly have the best international team in the business, and we are continuing to bring our industry-leading expertise, experience and know-how to strategic international markets."

20.     On September 27, 2018, Aphria announced the closing of the Acquisition.  In a press release, the Company stated that the Acquisition had provided "industry-leading cannabis-related" businesses in Latin America and the Caribbean which "firmly cements Aphria's leadership in the region and on the global cannabis stage."  The press release stated the following in pertinent part:

**Aphria Closes Acquisition of Assets in Latin America and the Caribbean**

Company cements foothold in the region with operations in
Colombia, Argentina and Jamaica

\*        \*        \*

*As a result of the Transaction, the Company has solidified an important foothold in Latin America and the Caribbean by acquiring industry-leading cannabis-related companies in Colombia, Argentina and Jamaica as well as a right of first offer and refusal in respect of a majority interest in a Brazilian entity seeking a cannabis cultivation and sales license.*

"Aphria continues to execute on its plans for strategic international expansion, including in Latin America and the Caribbean," said Vic Neufeld, Chief Executive Officer of Aphria.  "With a combined population of nearly 640 million, and with significant momentum from numerous countries introducing new or modernizing existing medical cannabis legislation, the region represents a significant opportunity for long-term growth.  It also hosts some of the most favourable conditions for cultivating high-quality medical cannabis at substantial efficiencies – ideal for both regional supply and export opportunities.  *This acquisition firmly cements Aphria's leadership in the region and on the global cannabis stage.*"

21.     From the time the Acquisition was announced in July 2018 until it closed in September 2018, the price of Aphria shares rose 75%, inflating the purchase price for the assets acquired by the Company in the Acquisition to over C$280 million.

22.     On October 18, 2018, Aphria filed a registration statement with the SEC pursuant to Section 12 of the 1934 Act on Form 40-F (the "Registration Statement").  The Registration Statement sought the registration of Aphria common shares to permit their trading on the NYSE.

23.     Attached as an exhibit to the Registration Statement was the Company's Management's Discussion & Analysis, which touted the Company's international expansion through strategic growth opportunities such as the Acquisition.  The Registration Statement stated in pertinent part:

The Company, one of the first cannabis companies in Canada and the first Canadian cannabis company to fully embrace and grow exclusively in a greenhouse, has shown the ability to grow at scale and generate a profit from

operations in a growing new industry. ***The Company continues to drive value for shareholders through its international expansion where Aphria is taking its experience and knowledge in the Canadian cannabis industry and applying it to newly federal legal markets. Aphria drives sustainable long-term shareholder value through a diversified approach to innovation, strategic partnerships and global expansion, with a presence in more than 10 countries across 5 continents.***

24.     On October 30, 2018, Aphria announced in a press release that its common shares had been approved for listing on the NYSE under the ticker symbol "APHA" effective November 2, 2018 (the start of the Class Period).   Existing shares of Aphria, which had previously traded in the U.S. on the OTCQB under the ticker symbol "APHQF" would now trade on the NYSE.   In addition, the Company's ticker symbol on the Toronto Stock Exchange was changed from "APH" to "APHA," also effective November 2, 2018.

25.     The statements referenced in ¶¶14-20, 23 above were materially false and/or misleading when made because they misrepresented and failed to disclose adverse facts which were known to defendants or recklessly disregarded by them, as follows:

(a)     that the Company had acquired assets in the Acquisition worth a fraction of the C$280 million estimated acquisition price;

(b)     that the assets acquired in the Acquisition lacked the established operations or strategic value represented by defendants;

(c)     that Company insiders and their affiliates had been the primary beneficiaries of the Acquisition, as they had sold assets of little or no value to the Company for a purchase price artificially inflated by tens of millions of dollars; and

(d)     that Company insiders and their affiliates had used privately-held shell companies, name changes, a multiplicity of transactions and other means to obscure their personal stakes and the extent of their self-dealing in the Acquisition.

26.     In addition, under the rules and regulations governing the preparation of the Registration Statement, defendants were required to disclose the full extent of the related party transactions and insider self-dealing in the Acquisition.

27.     Then, on December 3, 2018, analyst firms Hindenburg Research and Quintessential Capital Management ("QCM") issued a report and presentation that charged defendants with orchestrating a series of fraudulent transactions via the Acquisition in order to funnel tens of millions of dollars' worth of Aphria assets to Company insiders and their affiliates in exchange for assets that were worth a fraction of their purported value (if anything).  The report and its accompanying presentation encompassed collectively over 100 pages and included extensive corroborating evidence for the findings of fact contained therein, including on-site visits and photographs of the acquired assets and associated properties in the various host countries, interviews with personnel associated with the assets acquired in the Acquisition, government records, proprietary analysis and fact-gathering, and a review of additional supporting source material.  The primary report was entitled, "Aphria: A Shell Game With A Cannabis Business On The Side" (the "Report").  The Report included the following summary:

- We are of the strong opinion that Aphria is part of a scheme orchestrated by a network of insiders to divert funds away from shareholders into their own pockets.

- Aphria's recent C$280m Latin American acquisitions raise major red flags.  Our extensive on-the-ground research shows that the transactions appear to be largely worthless.

- Example: The official registered office of Aphria's C$145m Jamaican acquisition is an abandoned building that was sold off by the bank earlier this year.

- Example: Aphria's C$50m Argentine acquisition publicly boasted sales of US$11m in 2017.  A worker at the company, however, affirmed that 2017 revenue was only US$430k.

- Documents show that Aphria insiders were likely undisclosed beneficiaries of these deals. We noticed what appear to be systematic attempts to hide the true nature of these transactions. For example changing the names of the shell companies involved in a way that makes it harder to link them to Aphria's insiders.

- These M&A transactions are entirely financed by copious and dilutive share issuance. We estimate that Aphria has diverted upwards of C$700m via such transactions, or about 50% of Aphria's total net assets.

- Aphria consistently generates negative cash, and its cannabis seems to be of low quality. Interviews with sources describe facilities infested with bugs, stricken with mold, and having failed audit inspections [; and]

- Because Aphria generates a minimum amount of sales relative to its market cap, we believe that the uncovering of this alleged scheme, coupled with a massive asset write-off, would have catastrophic consequences for its share price.

28. Similarly, the Executive Summary of the Report published on the website of

QCM stated as follows:

**Executive Summary**

**Quintessential Capital Management has opened a SHORT position in Aphria (NYSE: APHA).**

In this report we present the results of our in-depth, investigative due diligence on Aphria and its related entities.

What would seem at the surface as a successful cannabis company, hides instead a more sinister reality. Based on a careful collection, analysis and interpretation of the facts, we are of the strong opinion that Aphria is part of a scheme orchestrated by a network of insiders to divert funds away from shareholders into their own pockets.

The scheme we reconstructed is simple: insiders acquire stakes in virtually worthless corporate entities overseas through shells companies located in jurisdictions where beneficial owners are kept secret. Shortly afterwards, insiders cause the public companies they control (or influence) to acquire these shells at enormous and unjustified markups, thereby generating large profits for themselves and setting up the end buyer, Aphria shareholders, for likely vast write offs in the near future.

In most instances, the entities acquired by Aphria exhibit little or no sales and operating activity, minimal assets and questionable corporate governance.

Insiders seem to exaggerate the nature of these entities, for example quoting what we believe are grossly inflated revenue figures or trying to portray expensive donations as "purchase orders".

More worryingly, we noticed what appear to us as systematic attempts to hide the true nature of these transactions, for example changing the names of the shell companies involved in a way that makes it harder to link them to Aphria's insiders. These M&A transactions are entirely financed by copious and dilutive share issues.

Because Aphria generates a minimum amount of sales relative to its market cap, we believe that, the uncovering of this alleged scheme, coupled with a massive asset write-off, would have catastrophic consequences for its share price.

29.     On this news, the price of Aphria stock plummeted, dropping approximately 25% to close at $6.05 per share on December 3, 2018 on abnormally large volume of over 35 million shares.

30.     On December 3 and December 4, 2018, Aphria issued statements denying the findings contained in the Report. However, Aphria's response failed to substantively address many of the issues of malfeasance and self-dealing that the Report had raised.

31.     On December 4, 2018, QCM issued a response to Aphria's denials of wrongdoing. The response stated in pertinent part:

After a careful review of Aphria's latest press release, we feel even more confident in our thesis. Aphria has merely repackaged the main contents of its past public statements, whilst conveniently avoiding addressing almost all of our very serious core allegations.

32.     On this news, the price of Aphria stock again fell approximately 25% to close at $4.51 per share on December 4, 2018 on abnormally large volume of over 29 million shares.

33.     Although the authors of the Report have a short interest in Aphria stock, the sharp decline in the price of Aphria shares demonstrates the credibility of the Report's detailed and corroborated findings and allegations of wrongdoing by defendants and the troubling lack of credibility and transparency in defendants' response. In addition, numerous equity analysts

downgraded the stock and/or slashed or removed price targets, including Eight Capital, BMO Capital Markets and GMP Securities, further demonstrating the credibility of the Report.

## LOSS CAUSATION AND ECONOMIC LOSS

34.     As detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Aphria shares during the Class Period and operated as a fraud or deceit on purchasers of Aphria shares.  As detailed above, when the truth about defendants' misconduct was revealed, the value of Aphria common stock declined precipitously as the prior artificial inflation no longer propped up the security's prices.  The declines in the prices of Aphria shares were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff, was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Aphria shares and the subsequent significant decline in the value of the Company's shares when defendants' prior misrepresentations and other fraudulent conduct were revealed.

35.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Company's business, operations and financial condition, as alleged herein.  Prior to the time of plaintiff's purchases of Aphria shares, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of Aphria shares to be artificially inflated.

Plaintiff purchased Aphria shares at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

36.    At all relevant times, the market for Aphria shares was an efficient market for the following reasons, among others:

(a)    Aphria shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's 2018 Annual Report, there were more than 161 million weighted average number of common shares outstanding during 2018, demonstrating a very active and broad market for Aphria shares;

(c)    as a regulated issuer, the Company filed periodic public reports with the SEC;

(d)    defendants regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)    unexpected material news about the Company was rapidly reflected in and incorporated into the price of the Company's shares.

37.    As a result of the foregoing, the market for Aphria shares promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Aphria shares.  Under these circumstances, a presumption of reliance applies to plaintiff's purchases of Company shares.

38.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding their business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

39.     Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by defendants, but rather statements of historical and present fact, and thus did not fall within any "Safe Harbor."

40.     Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Company, and thus were ineffective to shield those statements from liability.

41.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of the Company who knew that the FLS was false.  Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

- 15 -

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons or entities who purchased Aphria common stock during the Class Period on the NYSE (the "Class").  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  Company shares are actively traded on the NYSE under the ticker symbol "APHA."  For the year ended May 31, 2018, the Company had a weighted average number of common shares outstanding of more than 161 million shares.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

44.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants violated the 1934 Act;

(b)    whether defendants acted with scienter;

(c)    whether statements made by defendants to the investing public that artificially inflated the price of Aphria shares during the Class Period about the business, operations and risks of investing in the Company were false and misleading; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

47.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

48.    Plaintiff incorporates the foregoing paragraphs by reference.

49.    The Company and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.    These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff in connection with plaintiff's purchases of Aphria shares.

51.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, plaintiff paid artificially inflated prices for Aphria shares.  Plaintiff would not have purchased Aphria shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

52.    As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered damages in connection with their purchases of Aphria shares.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

53.    Plaintiff incorporates the foregoing paragraphs by reference.

54.    Defendants were control persons within the meaning of §20(a) of the 1934 Act and culpable participants in the fraud as detailed herein.

55.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the

investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. The Company, meanwhile, controlled the Individual Defendants and all of its employees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding plaintiff and the Class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

C.      Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

D.      Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: December 6, 2018                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                           SAMUEL H. RUDMAN


                                           _____
                                                  */s/ Samuel H. Rudman*
                                           SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

JOHNSON FISTEL, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/292-5690
212/602-1592 (fax)
scotth@johnsonfistel.com

*Attorneys for Plaintiff*

<u>**CERTIFICATION OF PLAINTIFF PURSUANT**</u>
<u>**TO THE FEDERAL SECURITIES LAWS**</u>

I, John Curkan, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 11/26/2018 | 200 | 8.80 |
| 11/26/2018 | 100 | 8.40 |
| 11/26/2018 | 100 | 8.09 |
| 11/27/2018 | 200 | 7.91 |
| 11/27/2018 | 200 | 7.75 |
| 11/30/2018 | 100 | 7.76 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 12/3/18 | 900 | 5.84 |

DocuSign Envelope ID: 7246B182-97D5-49B2-9D25-BA1748BEFF3

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6th day of December, 2018.

DocuSigned by:

John Curkan
John Curkan